# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| V. | ) | Criminal No. 07-00119 |
| | ) | Judge Nora Barry Fischer |
| DAWAAN EDWARD SMITH, | ) | |
| Defendant. | ) | |

## OPINION & ORDER

This matter is before the Court on a Motion to Suppress Evidence [34], filed by Defendant Dawaan Edward Smith on January 28, 2008.[1] On May 5, 2008, the Court held a hearing on the motion to suppress. For the following reasons, the Court will deny Defendant's motion to suppress.

## FINDINGS of FACT

The credible testimony offered at the May 5, 2008 suppression hearing established the following facts.[2]

On October 17, 2006, at approximately 11:30 p.m., narcotics detectives from the Pittsburgh Police Department were on patrol in two unmarked vehicles near the Rhine Court housing complex on the North Side of Pittsburgh, a "high drug and gun area."[3] (Transcript at 5:23-7:3) (Detective Emery testifying). The officers' patrol related to their responsibilities on the "Impact Squad," a part of the narcotics department "focused on street-level drug dealing and violence" in that area,

---

[1] Contemporaneously with the instant motion, Defendant also filed his Motions *in Limine* (Docket No. 35).

[2] All citations to "Transcript" refer to the May 5, 2008 hearing.

[3] Based on the testimony provided, it appears that Detectives Lewis and Martin Devine patrolled in one unmarked vehicle, and Detectives Judd Emery, Love, and Adametz patrolled in another unmarked vehicle. (*See* Transcript at 7:23-8:1).

including the housing complex at Rhine Court. (Transcript at 5:10-12) (Detective Emery testifying). In a parking lot at Rhine Court, the officers observed a white male (subsequently identified as Eric Michael) pacing back and forth and speaking on a cellular telephone. (Transcript at 8:2-22) (Detective Emery testifying). Detective Emery exited the unmarked vehicle and initiated surveillance on foot; likewise, Detectives Lewis and Devine parked and also began to conduct surveillance on foot from another direction.

For approximately five to seven minutes, the officers observed Mr. Michael and conducted surveillance of the scene when a silver Chevy Aveo pulled into the parking lot and parked near Mr. Michael. (Transcript at 9:14-18; 34:14-15) (Detective Emery testifying). Mr. Michael approached the passenger side of the vehicle and spoke with the driver[4] (subsequently identified as the Defendant, Dawaan Edward Smith). Because Mr. Michael had blocked his vantage point of the driver of the vehicle, Detective Emery radioed Detectives Love and Adametz "to move over and approach the two to find out what was going on." (Transcript at 11:1-3) (Detective Emery testifying). As Detective Emery approached on foot, he noticed that Defendant Smith exited the vehicle. Detectives Love and Adametz pulled into the parking spot immediately adjacent to the Chevy Aveo, approximately five to ten feet from Mr. Michael and the Defendant. Defendant Smith saw the unmarked vehicle and immediately fled.

As the Defendant fled, he pulled a black firearm from his right side. (Transcript at 40:17-21) (Detective Lewis testifying). Approximately ten feet into his pursuit of the Defendant (only a couple of seconds) and after he saw the Defendant pull a firearm from his right side, Detective Emery

---

[4] Per Detective Emery, it appeared that Mr. Michael knew the individual in the Chevy Aveo, i.e., the Defendant. (*See* Transcript at 10:13-15) (Detective Emery testifying).

informed his fellow officers by way of radio contact that the suspect had a firearm and then he announced his authority (i.e., Pittsburgh police) and ordered the Defendant to stop. (Transcript at 13:5-8; 30:23-31:10) (Detective Emery testifying). Despite Detective Emery identifying himself and ordering him to stop, the Defendant continued to flee. (Transcript at 33:20-21). Upon observation of the black firearm in his right hand, Detective Lewis, who also gave chase, deployed his taser. However, it did not subdue the Defendant. (Transcript at 41:4-11) (Detective Lewis testifying). Detective Lewis continued to pursue the Defendant, following Detective Devine down a hillside. Detective Lewis continued to order the Defendant to drop the gun and to stop. (*See* Transcript at 44:7-9) ("As long as he had that gun in his hand, I kept over and over again saying, drop the gun, drop the gun, police, police") (Detective Lewis testifying). Approximately halfway down the hill, Detective Devine observed the Defendant slip and, as he fell, he discarded the firearm "to the right of the pathway [that the officers] were running down." (Transcript at 57:7-14) (Detective Devine testifying). Per Detective Devine, who was about seven to eight feet from the Defendant at the time, the Defendant deliberately discarded the firearm.[5] (Transcript at 57:21-22) (Detective Devine testifying). Going down the hillside, Detective Lewis passed Detective Devine and, believing that he still had a firearm, pushed the Defendant forward, which caused him to stumble allowing Detective Lewis to tackle him. (Transcript at 44:13-25; 47:22) (Detective Lewis testifying). Even at this point, the Defendant still refused to comply with the officers' authority: "Because I told him

---

[5] Detective Devine testified that even though the officers were ordering the suspect to drop the gun (among other orders), it appeared to him that the Defendant did not drop the gun in response to the officers' orders. (Transcript at 60:24-61:1) (Detective Devine testifying). Instead, according to Detective Devine, the Defendant simply discarded the firearm "so he wouldn't get caught with it, not to follow commands by Detective Lewis." (Transcript at 61:6-9) (Detective Devine testifying).

3

to put his hands behind his back to detain him and he still continued to resist us." (Transcript at 45:3-4). Once the officers had the Defendant in custody, approximately one minute after he witnessed him discard the firearm, Officer Devine returned and recovered the firearm–a loaded "CZ".38 caliber semi-automatic pistol. (Transcript at 59:1-61:13) (Detective Devine testifying).

## PROCEDURAL HISTORY

On April 3, 2007, the Government filed an Indictment charging Defendant Dawaan Edward Smith with one count of Possession of a Firearm by a Convicted Felon, on or about October 17, 2006, in violation of 18 U.S.C. § 922(g)(1). After numerous extensions of time to file pre-trial motions, on January 28, 2008, Defendant Smith filed the instant Motion to Suppress Evidence and Motions in Limine. On February 11, 2008, the Government filed its Response to Defendant's Motion to Suppress, and on February 14, 2008, the Government filed its Response to Defendant's Motions in Limine. After two continuances of the suppression hearing, the Court held the same on May 5, 2008.

## ARGUMENTS PRESENTED

In his motion, Defendant moves to suppress all evidence seized from his arrest (including the firearm and drugs) because the "initial approach by the detectives of him and the other individual was an investigative detention unsupported by any reasonable suspicion." (Docket No. 34, at 2). Stated another way, Defendant requests that the Court suppress all evidence because "[p]rior to the initial approach and later the initiation of the chase, there were no circumstances to justify the investigative detention or the arrest of the Defendant." (Docket No. 34, at 2). In response, the Government asserts that "law enforcement was justified in their approach to Dawaan Smith, and had reasonable suspicion to stop and frisk him in light of the totality of the circumstances, including his

flight." (Docket No. 37, at 4). The Government further argues that, as to the firearm, the recovery of the same was not the result of a cognizable seizure under the Fourth Amendment to the United States Constitution because Defendant relinquished and abandoned the firearm during pursuit by law enforcement. (Docket No. 37, at 8-10).

Before addressing the substance of the parties' argument, the Court notes that it is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citations omitted).

## ANALYSIS

As a threshold point, the Court acknowledges that a police officer may approach a person on the street in the absence of reasonable suspicion of criminal activity, if the officer does not detain the person. The Supreme Court has confirmed this well-settled principle:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention-no seizure within the meaning of the Fourth Amendment-then no constitutional rights have been infringed.

*Florida v. Royer*, 460 U.S. 491, 497-498 (1983) (internal citations omitted). Accordingly, it is

beyond dispute that the police officers' mere approach towards Defendant and Mr. Michael in a public parking lot does not, in and of itself, constitute a seizure within the meaning of the Fourth Amendment. (*See* Transcript at 11:21-12:1) ("Q: What was your purpose in getting closer to the area of getting closer to the driver, Dawaan Smith? A: Our--my position of surveillance was gone. I just wanted to approach to find out what the two were doing, why, you know, they were meeting in that area at that time of night") (Detective Emery testifying). Accordingly, to the extent that Defendant asserts that the officers needed reasonable suspicion to merely approach Mr. Michael and the Defendant and to ask questions, (*see* Transcript at 12-14) (counsel for Defendant arguing that "[o]ur position is that there was no reasonable suspicion for the officers to even approach the defendant in the parking lot given what they had seen"), the Court finds that the same is not supported by the case law. However, before proceeding to the *Terry* analysis, the Court must first determine when the officers seized Defendant Smith hence triggering the protections of the Fourth Amendment because the same is not implicated until a seizure occurs.[6] *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment").

While the Government addresses this issue in detail asserting that the Defendant was not seized until after the pursuit and after he discarded the firearm, (Docket No. 37 at 8-10), the Defendant seemingly argues that the officers seized the Defendant well before: "Defendant further avers that the investigative detention immediately escalated in a full-scale arrest and seizure when he was chased and tasered by the officers."[7] (Docket No. 34, at ¶10). However, the case law simply

---

[6] The Court notes that while the Government addresses this issue at the end of its brief, the Court feels that it is more properly addressed at this point.

[7] Defendant cites no case law in support of his argument.

does not support Defendant's position.

As pointed out by the Government, relevant to this analysis is *California v. Hodari D.*, 499 U.S. 621 (1991), in which the Supreme Court found that for purposes of the Fourth Amendment, a seizure occurs when police apply physical force to the person being seized, or, where force is absent, the person submits to the show of police authority. *Id.* at 626-28;[8] *see also United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000). "[I]f the police make a show of authority and the suspect does not submit, there is no seizure." *Valentine*, 232 F.3d at 358 (citing *Hodari D.*, 499 U.S. at 626). As an initial matter, it is significant to note there is no evidence that the officers displayed any show of authority (such as sirens or lights) as they approached Mr. Michael and the Defendant in their unmarked vehicle. Likewise, the testimony indicates that the Defendant fled before the officers in the vehicle identified themselves as law enforcement. Furthermore, when the officers pulled their unmarked vehicle next to the Chevy Aveo in the parking lot at Rhine Court, the officers' vehicle did not block or otherwise create a barrier obstructing the Defendant in any way. (Transcript at 13:17-25) (Detective Emery testifying). Considering Defendant's flight as well as his continual refusals to submit to law enforcement despite the officers' announcement of their authority and orders to stop, the Court finds that the officers did not seize the Defendant for purposes of the Fourth Amendment analysis until they apprehended him.[9] *See Hodari D.*, 499 U.S. at 629 (providing that

---

[8]

*Hodari D* built upon two prior Supreme Court cases: *United States v. Mendenhall*, 446 U.S. 544 (1980) and *Michigan v. Chesternut*, 486 U.S. 567 (1988), in which the Court addressed the standard for when a seizure occurs for purposes of the Fourth Amendment.

[9]

At the suppression hearing, counsel for Defendant cross-examined Detective Devine as to whether the Defendant complied with the officers' orders to drop the firearm as they gave chase. (*See* Transcript at 62:7-63:9) (Detective Devine testifying). However, Detective Devine testified that it appeared that the Defendant discarded the firearm "so that he wouldn't get caught with it, not to

"since [defendant] did not comply with that [show of authority] he was not seized until he was tackled"). Accordingly, all conduct prior to said seizure may be included in the reasonable suspicion analysis of the *Terry* stop. *See Valentine*, 232 F.3d at 359 (providing that "what [defendant] did after he failed to comply with a police order and prior to a seizure may be considered in evaluating reasonable suspicion").

Having determined that the police seized Defendant at the time they apprehended him, the Court now turns to whether that stop and seizure was justified, i.e., within the bounds of *Terry*.

Under *Terry*, police officers may stop and briefly detain and pat down an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1 (1968). The scope of a valid *Terry* stop includes a brief detention of the person and a pat-down search for weapons short of a traditional arrest. *See Terry*, 392 U.S. at 22-24, 27; *United States v. Yamba*, 506 F.3d 251, 256 (3d Cir. 2007). The level of suspicion required for a *Terry* stop is "somewhat lower" and "can be established with information that is different in quantity or content than that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006);

---

follow commands by Detective Lewis." (Transcript at 61:8-9) (Detective Devine testifying). Nevertheless, even assuming *arguendo* that the Defendant dropped the firearm in response to the officers' continual orders, Defendant's brief compliance with authority in light of his decision to continue to flee fails to rise to the level of a seizure for purposes of the Fourth Amendment. *See Valentine*, 232 F.3d at 359 ("Even if [the defendant] paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until [the police officer] grabbed him"). Along the same lines, counsel for Defendant argued at the suppression hearing that the "taking out of the taser with the intent to use it" by Detective Lewis constituted a seizure. (Transcript at 68:10-13). The Court finds this argument to be flawed because, as required by *Mendenhall* and *Hodari D.*, despite the purported "show of authority" by way of the taser, Defendant did not submit to the officers' show of authority but instead continued to flee. *See Hodari* D., 499 U.S. at 628 (discussing a prior case regarding when a seizure occurs and explaining that "[w]e did not even consider the possibility that a seizure could have occurred during the course of the chase because, as we explained, that 'show of authority' did not produce his stop") (citations omitted); *see also Valentine, supra*.

*see also Alabama v. White*, 496 U.S. 325, 330 (1990). Applying an objective standard as to whether the reasonable suspicion standard has been met, "the totality of the circumstances-the whole picture-must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

The U.S. Court of Appeals for the Third Circuit has articulated several factors that courts may consider in determining whether reasonable suspicion exists, including "[a suspect's] location, a history of crime in the area, [a suspect's] nervous behavior and evasiveness, and [the officers'] 'commonsense judgments and inferences about human behavior.' " *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reiterating that officers must be allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"). Against this context, the Court turns to the instant facts.

First, the officers encountered the Defendant in high crime area. (*See* Transcript at 39:10) (describing the area as one involving "firearm violations, drug violations, [and] homicide suspects") (Detective Lewis testifying). While "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)), the law does *not* require officers "to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," *id.* Therefore, a court may consider "the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 144, 147-148 (1972)); *see also U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1978) (finding reasonable suspicion where police on patrol observe youths running from a store in a high

9

crime neighborhood). Along the same lines, the time of day of the encounter between the officers and Mr. Michael and the Defendant colors a suspect's conduct contributing to the reasonable suspicion analysis.

Second, the suspicious behavior of Mr. Michael aroused the suspicion of the officers that Mr. Michael committed or was committing a crime, specifically a drug transaction. In particular, in light of the surroundings, i.e., high crime area at 11:30 p.m., Mr. Michael's pacing back and forth and "looking down the street, looking up the street" while talking on a cellular telephone and acting "jittery" indicated to the police officers' trained eye that a criminal transaction may be taking place.[10] (Transcript at 8:21-9:4) ("Q: Now, these behaviors, were they, why did they attract your attention in your experience? A: It is consistent with someone attempting to purchase narcotics") (Detective Emery testifying). Otherwise innocent conduct, when viewed in the eyes of the experienced officer,[11] can be given suspicious connotation by the circumstances. *See Davis v. United States*, 409 F.2d 458, 460 (D.C. Cir. 1969) ("Conduct innocent in the eyes of the untrained may carry entirely

---

[10] At the suppression hearing, Detectives Emery and Lewis testified regarding the presence of Mr. Michael (a white person) as standing out in a predominantly black neighborhood. (*See* Transcript at 19:15-18; Transcript at 48:21-49:2). Generally speaking, courts hold that race alone will not support a support a *Terry* stop under the Fourth Amendment. *See Brown v. City of Oneonta, New York*, 235 F.3d 769, 776 n.3 (2d Cir. 2000) (Walker, C.J., concurring in the denial of rehearing en banc) (collecting cases in accord); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975) (holding that Hispanic appearance alone is insufficient to justify a stop). Hence, the Court attaches no significance to the race of Mr. Michael and the racial make-up of the neighborhood in its *Terry* analysis.

[11] In this case, all three detectives that testified at the suppression hearing had extensive experience working in narcotics investigations. *See* (Transcript at 4:13-18) (Detective Emery testifying regarding seven years as a Pittsburgh police officer in narcotics and vice); (Transcript at 36:9-18) (Detective Lewis testifying regarding approximately eight years as a Pittsburgh police officer with experience in federal firearm violations); (Transcript at 55:7-16) (Detective Devine testifying regarding nine years as a Pittsburgh police officer and four years specific to narcotics).

different 'messages' to the experienced or trained observer").

Third, similarly to the facts in *Wardlow*, "unprovoked flight upon noticing the police," especially in a high crime area, raises the ire of suspicion of criminal activity:

> Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Illinois v. Wardlow*, 528 U.S. 119, 124-125 (2000). *See United States v. Brown*, 159 F.3d 147, 150 (3d Cir. 1998) (considering, among other factors, suspect's "attempt[] to elude [officer] by ducking into an alleyway and a bar"); *Rundle*, 461 F.2d at 864 (3d Cir. 1978) (finding flight from law enforcement, combined with other factors, supports *Terry* stop); *United States v. Pope*, 561 F.2d 663, 668 (6th Cir. 1977) ("Flight invites pursuit and colors conduct which hitherto has appeared innocent"). While the officers were in an unmarked vehicle, Defendant Smith did not flee until the officers parked their vehicle directly adjacent to the Chevy Aveo, approximately five to ten feet away from where Mr. Michael and the Defendant were standing and talking. Furthermore, the vehicle was "equipped with lights and sirens" and, considering the close proximity of the vehicle to the Defendant, it is reasonable to infer that the Defendant recognized (or, at the very least, suspected) the vehicle as one associated with law enforcement, and then fled. (*See* Transcript at 39:1-3) ("Q: In your experience, is the make and model of the vehicle familiar to some people who are trying to avoid police? A: Yes") (Detective Lewis testifying). Therefore, the Court finds that the Defendant's unprovoked flight in a high crime area justified the *Terry* stop and search. *See United States v.*

*Higgins*, CRIM. No. 89-00304, 1989 WL 119070, at *2 (E.D. Pa. Oct. 3, 1989) ("The defendant's unprovoked flight from a location notorious for drug trafficking upon seeing police approach would have justified the officers in making a *Terry* investigative stop of the defendant"). Furthermore, during the pursuit, the Defendant continually refused to obey lawful police orders, which may also contribute to a determination of reasonable suspicion.[12] *See United States v. Brown*, 159 F.3d 147, 150 (3d Cir. 1998) (considering suspect's decision to "disregard[] the officer's request to 'hold up' and continue[] walking"); *United States v. Moorfield,* 111 F.3d 10, 14 (3d Cir. 1997) (finding that, among other factors, suspect's "refusal to obey the officers' orders constituted suspicious behavior"); *United States v. Focareta*, Criminal No. 05-227, 2006 WL 2087515, at *10 (W.D. Pa. July 25, 2006) (finding that "given the time of day, the multiple reports emanating from [the site of the incident] about criminal activity, including the theft of firearms, and *most importantly*, [the defendant]'s repeated furtive gestures and failure to follow officers' orders, ... reasonable suspicion existed for the officers' *Terry* stop of [the defendant]") (emphasis added).

Considering the totality of the circumstances, in particular the suspicious behavior of Mr. Michael in the parking lot in a high crime area known for drug transactions and firearm offenses, the time of day (11:30 p.m.), the Defendant's unprovoked flight upon sight of a vehicle that appeared to be law enforcement, Defendant's continual refusals to submit to law enforcement despite the officers' announcement of their authority and numerous orders to stop and to drop the firearm, and the Defendant's discarding of a firearm during pursuit, the Court finds that said circumstances

---

[12] Detective Lewis testified that even though the Defendant did not acknowledge the lawful orders from the chasing officers during the pursuit, once he detained him, the Defendant appeared coherent, oriented to time and place, and able to understand and, in fact, responsive to the officers at that time. (Transcript at 52:25-53:22).

warranted, at a minimum, a *Terry* stop and frisk of the Defendant.

## CONCLUSION

Based on the foregoing, the Court **DENIES** the Motion to Suppress Evidence [DE 34]. However, as to Defendant's Motions in Limine [35], the Court defers its ruling on said motion until the time of trial so that the Court may consider such evidence in context. *See United States v. Davis*, 235 F.R.D. 292, 314-315 (W.D. Pa. 2006).

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   June 4, 2008

cc:     All counsel of record.